# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| ROBERT CHARLES (ROB) KEPPLER, III, ) <br> ) <br>     **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> WILLIAM EDWARD (BILL) HASLAM, ) <br> ET AL., ) <br> ) <br>     **Defendants.** ) | Case No. 3:11-CV-1040 <br> Judge Aleta A. Trauger |

## MEMORANDUM

The defendants have filed a Motion for Summary Judgment (Docket No. 36), to which the plaintiff has filed a Response in opposition (Docket No. 41). For the reasons stated herein, the defendants' motion will be granted.

## BACKGROUND

### I.  Contextual Allegations

Although plaintiff Robert Keppler has not substantiated his Amended Complaint allegations with evidence, as he was required to do at this stage, the court will reference those allegations only for contextual purposes. (*See* Docket No. 10, Am. Compl.) In the Amended Complaint, Keppler alleged that, on October 29, 2011, while protesting on Nashville's Legislative Plaza as part of the "Occupy Nashville" movement, law enforcement officers injured him while purporting to enforce curfew and permit requirements issued by Tennessee Governor Bill Haslam on October 27, 2011 ("Use Policy"). Keppler, who claims to be disabled, alleged that the officers violently seized him, used excessive force to place him in wrist restraints, dragged him across Legislative Plaza, placed him in a choke hold, forced his fingers into his

1

nostrils, and then dropped him face down on the concrete. As result of this incident, he sued Governor Haslam, Commissioner of the Department of Safety and Homeland Security for the State of Tennessee ("TDOS") Bill Gibbons, Commissioner of the Department of General Services ("DGS") Steven Cates, and Tennessee Highway Patrol Lieutenant Preston Donaldson. The Amended Complaint asserted claims against all defendants for "civil conspiracy" (¶ 24) (source of law unspecified), against all defendants under the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. § 29-20-101 *et seq.* (¶ 27), against Donaldson for "civil conspiracy, negligence and gross negligence" for failure to train and/or supervise unidentified John Doe law enforcement officers (¶ 26), and against the John Does ("John Doe Defendants') for "assault, battery, false imprisonment, false arrest, intimidation, excessive force and an unlawful search and seizure . . . ." (¶ 25.) The court previously dismissed the official capacity claims and Keppler's demand for injunctive and declaratory relief (*see* Docket Nos. 16 and 30), leaving only Keppler's claims for monetary damages against the defendants in their individual capacities. The defendants have moved for summary judgment on these remaining monetary damages claims.[1]

## II.  **Facts**

The facts of this case are undisputed and are drawn entirely from the defendants' Statement of Undisputed Facts and the affidavits and deposition testimony filed by the

---

[1]In support of their joint Motion for Summary Judgment, the defendants have filed the following materials: (1) a Memorandum of Law (Docket No. 37), a Statement of Undisputed Facts (Docket No. 38); (2) individual affidavits from Donaldson (Docket No. 36, Ex.1), Roger Hutto (General Counsel for the Tennessee Department of Safety and Homeland Security) (*id.*, Ex. 2), and Thaddeus Watkins (General Counsel for the Tennessee Department of General Services) (*id.*, Ex. 3); and (4) an affidavit from the deposition of Keppler (*id.*, Ex. 4.).

defendants in support of their motion.[2]  The purpose of the Use Policy was to protect the War Memorial Plaza, the protestors, and the public following reports of assaults, thefts, drug transactions, and other criminal acts where the protestors had set up their tents.  On October 26, 2011, the day before the Use Policy was drafted and implemented, representatives of the protestors met with officials from TDOS and DGS (including Commissioner Cates) to report safety issues and request additional security.  The Occupy Nashville representatives complained that the protestors needed bathrooms and other hygiene facilities, which they asked the state to furnish at its own expense.  Commissioner Gates informed the Occupy Nashville representatives that he would grant use permits on a day-to-day basis with reasonable conditions.  The state received other reports of safety concerns, sanitation issues, and health issues.

Commissioner Gibbons and Commissioner Cates were concerned for the safety and welfare of the citizens who were sleeping and staying on the Plaza overnight, the sanitation and hygiene issues that had been raised, and the damage to the Plaza that was occurring.  At no time did anyone in the DGS, TDOS, the Governor's Office, or anyone else involved in the formulation or approval of the Use Policy express an intention to deprive anyone of their civil rights.  The Use Policy and its implementation did not reflect any malice towards the Occupy Nashville movement.  Instead, the Use Policy and its enforcement reflected a response to concerns about safety, sanitation, health, and damage to public property.

---

[2]Keppler has expressly adopted the defendants' Statement of Undisputed Facts, he asserts no objections thereto, and he has introduced no facts of his own.  (*See* Docket No. 41, Keppler Resp. at p. 1); *see also* Local Rule 56.01(g).  Under the circumstances, the court is obligated to adopt the facts presented by the defendants in this case and to apply the law to those facts.  However, the court expresses no opinion as to whether these facts (including the intent of each defendant with respect to the Use Policy and its implementation) could be rebutted in a different case based on competent evidence, in a manner sufficient to create a triable issue of fact.

Lieutenant Donaldson was not aware of the Use Policy until after it was written, nor was he involved in creating it. Donaldson did not recommend, suggest, organize, or supervise the operation (or the associated officers) that led to the arrests of Occupy Nashville protestors and Keppler's alleged seizure, nor did he witness or participate in Keppler's alleged seizure. He never provided training to the officers involved in the Occupy Nashville operation. The officers that he supervises have never been accused of mistreating disabled individuals. To the best of his knowledge, they are adequately trained in the care of disabled persons and are trained in the proper use of the force continuum. With respect to the Occupy Nashville operation, Donaldson did not take any actions intending to deprive anyone of their civil rights, he does not and did not harbor any prejudice towards the Occupy Nashville participants, he treated the protestors with respect at all times, and he did not conspire with anyone to deny any person their civil rights.

At his deposition, Keppler was unable to articulate specific actions taken by the named defendants that support his claims.[3] Furthermore, Keppler has failed to present any evidence supporting the allegations discussed in the previous section. Therefore, the record contains no evidence that Keppler actually participated in the Occupy Nashville protests, that he was seized on the alleged date, that he was injured in that alleged incident, or that he is actually disabled.

---

[3]Keppler testified that he sued Donaldson based on his subjective belief that Donaldson "he was in charge of . . . the attack on the peaceful protestors." (Docket No. 36, Ex. 4, Keppler Dep. at 98:17-19.) However, he admitted that his belief in Donaldson's involvement predicated only on "an assumption on my part that the lieutenant of the state police would be in charge of his subordinates. I'm not sure who's in charge of them." (*Id.* at 98:20-99:1.) Keppler also testified that Governor Haslam "evidently" signed the Use Policy, but Keppler articulated no other actions taken by Haslam that supported his claims. (*Id.* 98:2-9.) Keppler was unable to articulate any actions taken by Commissioner Gibbons or Commissioner Cates related to his claims. (*Id.* 98:10-15.)

## **SUMMARY JUDGMENT STANDARD**

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2013). At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex*, 477 U.S. at 325). "When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).) The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.*

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587). But "[t]he mere existence of a scintilla of evidence in support of the non-moving

party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252), and the non-movant's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249. An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## ANALYSIS

The defendants have asserted that Keppler's claims fail for multiple independent reasons. Keppler has filed only a cursory Response in opposition that largely fails to address the defendants' arguments, cites no facts in the record, references no caselaw authority, largely relies on the plaintiffs' *allegations* as stated in the Amended Complaint (*see* Docket No. 41 at p. 3 ("Plaintiff has sufficiently pleaded his case.")), and does not even purport to articulate (let alone substantiate) the specific theories of liability applicable to each defendant. Therefore, although captioned as a "Response" in opposition, Keppler has essentially failed to rebut any of the defendants' arguments, which the court finds persuasive for the reasons explained herein. To the extent Keppler has failed to address the defendants' challenges to particular claims in his Response, the court may treat Keppler as implicitly abandoning those claims. *See Gibson-Holmes v. Fifth Third Bank*, 661 F. Supp. 2d 905, 912 (M.D. Tenn. 2009); *Dage v. Time Warner Cable*, 395 F. Supp. 2d 668, 679 (S.D. Ohio Oct. 19, 2005); *Kattar v. Three Rivers Area Hosp. Auth.*, 52 F. Supp. 2d 789, 798 n.7 (W.D. Mich. 1999). Subject to that assumption, the court addresses the defendants' challenges herein.

I.  **Claims Against John Doe Defendants**

Keppler has not identified or served any "John Doe Defendant," nor has he sought leave

6

to do so. Furthermore, he does not contest that leave to amend would be inappropriate under Fed. R. Civ. 15(c), nor does he dispute that claims against the John Doe Defendants would be time-barred by Tennessee's one-year statute of limitations, in any case. *See Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996) (amendment to name previously unidentified officers did not relate back, where statute of limitations had already run); *Jackson v. Richards Med. Co.*, 961 F.2d 575, 578 (6th Cir. 1992) (one-year statute of limitations in Tenn. Code Ann. § 28-3-104(a)(1) applies to § 1983 claims arising in Tennessee); *see also Gibson*, 661 F. Supp. 2d at 912 (implicit abandonment of claims based on failure to address challenges thereto). The court construes Keppler as conceding – as he must – that the claims against the John Doe Defendants must be dismissed.

## II. Claims Against Named Defendants

### A. TGTLA Claims

The TGTLA applies to municipal, county, and local governments, including their agents and employees, but not to the Tennessee state government, its agencies or departments, or state officials. *Tenn. Dep't of Mental Health & Mental Retardation v. Hughes*, 531 S.W.2d 299, 300 (Tenn. 1975). Thus, the defendants, who are all state officials, are not subject to the TGTLA.[4] Indeed, Keppler has not disputed that summary judgment is appropriate on the TGTLA claims, reflecting his implicit abandonment of those claims.

### B. Conspiracy Claims

---

[4]Even if the court were to construe these claims as asserted against the State of Tennessee, the state retains sovereign immunity that was not abrogated by the TGTLA. *See Lenoir v. Porters Creek Watershed Dist.*, 586 F.2d 1081, 1089 (6th Cir. 1978) (stating that the TGTLA "removed governmental immunity as a defense to a large class of tort suits with regard to local, but not state, units of government.")

7

Keppler has alleged claims for "civil conspiracy" against Haslam, Gibbons, Cates, and Donaldson, without specifying the source of law. Based on Keppler's Response to the defendants' motion, the court construes Keppler as asserting conspiracy claims under 28 U.S.C. §§ 1983 and 1985, but not under Tennessee law. (*See* Docket No. 41 at p. 3 ("Plaintiff implicitly pleads individual actions . . . which are actionable under Sec. 1983 and Sec. 1985.")).

    1.    <u>§ 1985(3) Conspiracy Claim</u>

To succeed in establishing a conspiracy claim under § 1985(3), the plaintiff must demonstrate "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 832 (6th Cir. 2007) (quoting *Vakilian v. Shaw*, 335 F.3d 509, 518 (6th Cir. 2003)). The plaintiff must show that the deprivation at issue was caused by "class-based discriminatory animus." *Newell v. Brown*, 981 F.2d 880, 886 (6th Cir. 1992); *Vakilian*, 335 F.3d at 518-19. "A class protected by section 1985(3) must possess the characteristics of a discrete and insular minority, such as race, national origin, or gender." *Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 994 (6th Cir. 1994).

Here, Keppler has not established any element of a § 1985(3) claim. First, he has not presented evidence that the defendants conspired in any fashion, let alone for an improper purpose. Second, he has created a genuine dispute of fact as to whether the defendants intended to deprive the Occupy Nashville protestors of their constitutional rights. Third, even if there

8

were a "conspiracy," Keppler has not identified any particular acts taken by the individual defendants in furtherance of the conspiracy.[5] Fourth, Keppler has not presented any evidence that he was injured or that he was deprived of any rights secured by the United States Constitution; indeed, he has not even presented evidence that he participated in the Occupy Nashville protests in the first place, let alone that he suffered some form of injury or deprivation of rights on October 29, 2011. Fifth, even assuming that he did participate in the protests and suffer an injury, Keppler has not provided any authority showing that the protestors constitute a discrete and insular "class" protected by § 1985(3). Sixth, even if the protestors were protected by § 1985(3), Keppler has not created a genuine dispute of fact as to whether the defendants harbored animus towards the protestors and intended to deprive them of their constitutional rights; indeed, he has provided no evidence rebutting the defendants' representations that they sought to protect the protestors and the public against criminal activity, to promote hygiene, and to protect state property, all of which are legitimate state interests that involve no improper animus. For any of these reasons, the § 1985(3) claims fail as a matter of law.

2. § 1983 Conspiracy Claim

"A civil conspiracy under § 1983 is 'an agreement between two or more persons to injure another by unlawful action.'" *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (quoting *Revis v. Meldrum*, 489 F.2d 273, 290 (6th Cir. 2007)). To prevail on a civil conspiracy claim under § 1983, Keppler must show that (1) a single plan existed; (2) each defendant shared in the general conspiratorial objective to deprive Keppler of his constitutional rights, and (3) an

---

[5]The fact that Haslam signed the Use Policy, standing alone, does not constitute an act in furtherance of an unspecified "conspiracy."

overt act was committed in furtherance of the conspiracy that caused injury to Keppler. *See Bazzi*, 658 F.3d at 602. "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy and each conspirator need not have known of the details of the illegal plan or all of the participants involved." *Id.* (internal brackets omitted); *see also Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 563 (6th Cir. 2011).

Here, as with the § 1985(3) conspiracy claim, Keppler has not substantiated several elements of his § 1983 conspiracy claim. He has not produced evidence that the defendants actually conspired in any respect: the record contains no evidence showing a "conspiratorial objective," a "single plan" involving one or more of the defendants, or (even if there were such an objective and a plan to carry it out) any "overt act" committed by one or more defendants in furtherance thereof. Moreover, as stated above with respect to the § 1985(3) conspiracy claim, Keppler has not presented evidence rebutting the defendants' contentions that they had no unlawful intent to injure Keppler or to deprive him (or the other alleged protestors) of constitutional rights. Finally, as discussed above, Keppler has not even established that he participated in the Occupy Nashville movement or that his rights were violated in the first place. For any of these reasons, the § 1983 conspiracy claims must fail.[6]

### C. Claims Against Donaldson

---

[6]Because Keppler's conspiracy claims fail as a matter of law for the aforementioned reasons, the court need not address the defendants' remaining arguments that the intra-corporate conspiracy doctrine bars the claims, that Keppler's Amended Complaint allegations are insufficient to state a conspiracy claim, and/or that the defendants are entitled to qualified immunity. Also, because the court construes Keppler as asserting only federal conspiracy claims, the court need not address the defendants' argument that a conspiracy claim under Tennessee law would fail as well. Even if Keppler had articulated such a theory, it would have failed for substantially the same reasons as the § 1985(3) and § 1983 conspiracy claims.

The Amended Complaint alleges claims against Donaldson for "civil conspiracy, negligence and gross negligence" for failure to adequately train and/or supervise the John Doe Defendants. . . ." (Am. Comp. ¶ 26.) The Amended Complaint did not specify whether these claims arise under federal law and/or state law. At any rate, regardless of the source of law, the "conspiracy" claim against Donaldson fails for the reasons stated in the previous section. In this section, the court addresses the remaining claims against Donaldson, which the court construes as a supervisory liability claim arising under § 1983 and as claims for negligence and gross negligence arising under Tennessee state law.

A plaintiff pursuing a supervisory liability claim under § 1983 "must be based on more than the right to control employees." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). A defendant cannot be held liable under § 1983 on a respondeat superior or vicarious liability basis. *Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir. 2012). Instead, personal liability requires "some proof that a defendant has a culpable state of mind – that the action or failure to act was to some degree deliberate rather than inadvertent." *Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869, 873 (6th Cir. 1982). As set forth in *Bellamy*:

> There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.

729 F.2d at 421; *see also Hays*, 668 F.2d at 874 ("Where . . . the constitutional violation was not alleged to be part of a pattern of past misconduct, a supervisory official or a municipality may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable, or

11

would properly be characterized as substantially certain to result.") (internal citations omitted). The plaintiff must also demonstrate a causal relationship between the alleged misconduct and the official sued. *Dunn v. State of Tenn.*, 697 F.2d 121, 128 (6th Cir. 1983); *Danese v. Asman*, 875 F.2d 1239, 1244-45 (6th Cir. 1989).

Here, Donaldson is entitled to judgment on the § 1983 supervisory liability claim for several reasons. Keppler has not rebutted Donaldson's representations that he (Donaldson) was not involved in creating or passing the Use Policy, that he did not organize the operation or supervise the officers during the incident at issue, that he did not witness or participate in the alleged seizure of Keppler, and that he was not involved in training the officers involved in the operation. Donaldson cannot be held liable under a supervisory liability theory merely because he is generally a supervisory officer.

Furthermore, Keppler has not produced evidence that the incident was more than an isolated incident, rather than part of a pattern of past misconduct. Despite the heightened standard applicable to such an isolated incident, Keppler has not produced any evidence concerning the types of training the officers received (or failed to receive), nor has Keppler produced evidence attempting to link the officers' training to his alleged injuries. Thus, even if there were evidence of a failure to train (which there is not), there is no causal link between the unidentified officers' unspecified training and the alleged incident involving Keppler.

Moreover, as discussed above, Keppler has not even presented evidence concerning his participation in the alleged protests and his alleged injuries in the first place. For any of these reasons, the § 1983 supervisory liability claim against Donaldson must fail.

As to the negligence and gross negligence claims, Keppler has not responded to the

defendants' contention that he has failed to show the elements of either claim under Tennessee law. *See McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). Furthermore, Tenn. Code Ann. § 9-8-307(h) protects state officials from liability for acts or omissions made within the scope of their employment, except for willful, malicious, or criminal acts or omissions or for acts or omissions done for personal gain. Keppler has not disputed the defendants' argument that this statute immunizes Donaldson against the negligence and gross negligence claims. Keppler's failure to respond to either of the defendants' arguments concerning the negligence and gross negligence claims constitutes implicit abandonment of those claims. Even if Keppler had not implicitly abandoned these claims, the court would find that they fail as a matter of law.

## CONCLUSION

For the reasons stated herein, the defendants' Motion for Summary Judgment will be granted and Keppler's claims will be dismissed with prejudice.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge